BILLY O. AGNEW, and BILLY O. AGNEW, as Agent and Representative of HENRY NORTON, WILLIAM HEINSON, ARTHUR SHAFFER, HARVEY G. CARNES, HERBERT WYMAN, ORVILLE SANNERS, OLIVE R. SANNERS v. J. A. JOHNSON, doing business as JOHNSON EVERYTHING STORE, Appellant.—No. 38600.—176 S. W. (2d) 489.

Division Two, December 6, 1943.

Motions for Rehearing and to Transfer to Banc Overruled, January 3, 1944.

O. H. *Swearingen* for appellant; *Ira B. McLaughlin* of counsel.

*Robert H. Miller* and *Thomas F. Wells* for respondent; *Julius C. Shapiro* of counsel.

WESTHUES, C.—Plaintiff, Agnew, filed this suit for himself and others similarly situated against the defendant for unpaid wages alleged to be due them under the United States Fair Labor Standards Act of 1938, U. S. C. A., 29, page 439. A jury was waived and the case was tried before Hon. Marion D. Waltner, Judge of the Jackson County Circuit Court at Independence, Missouri. The court found the issues in plaintiff's favor and entered a judgment in the sum of $13,948.04. The defendant duly appealed.

The amounts, as claimed in the petition to be due the parties for whom plaintiff filed suit, are as follows: Billy O. Agnew, $233.99; Henry Norton, $939.89; William Heinson, $167.25; Arthur Shaffer, $728.14; Herbert Wyman, $567.57; Harvey G. Carnes, $1742.82; Orville Sanners, $1815.88; Olive R. Sanners, $1086.89. Claimants also asked for damages in a sum equal to the amount of wages alleged to be due and for attorneys' fees. The answer of the defendant was a general denial. The court entered a judgment for the benefit of the parties for whom suit was filed as follows: Billy O. Agnew, $233.99; Henry Norton, $939.89; Arthur Shaffer, $541.94; Herbert Wyman, $522.57; Harvey G. Carnes, $1,742.82; Orville Sanners, $1,505.92; Olive R. Sanners, $1,086.89. In addition to the above sums the court entered judgment of an equal amount as damages for the benefit of each party named. It allowed an attorneys' fee of $1,000.00.

The defendant insists that the evidence was not sufficient to sustain a judgment in plaintiff's favor. Since the case was tried before a court sitting as a jury our inquiry is limited to an examination of the record to determine whether plaintiff introduced substantial evidence in support of the claims made. We do not try the case de novo on questions of fact. The defendant was engaged in buying and selling second-hand and new furniture, old farm machinery, old cars, tools of all kinds and junk consisting of rags, papers, scrap iron and metals. In fact, as defendant testified, in his business he would buy anything anyone had for sale if he thought he could make a

profit from the transaction. If in the course of such business articles could be repaired so as to be useful that was done and they were then resold to parties desiring to use them. If an article was beyond repair it was dismantled, broken up and placed in a pile to be sold as junk, metal or old scrap iron. Metals were separately kept because they were of greater value. Claimants in this case contended that they were employed by defendant and that they were required to work about eleven hours per day and often on Sundays. To be specific we quote from the evidence of Herbert Wyman:

"State to the Court the time you worked, your hours per day. A. Seven o'clock in the morning, get to work sometimes at six-thirty, sometimes—

"Q. How many hours per day did you actually put in in your employment? A. Eleven hours.

"Q. How many days a week did you work? A. Seven.

"Q. Were you directed and instructed every day of the week including Sundays? A. Get off probably a Sunday a month.

"Q. How much were you paid during the time you were working for him from October 24, 1938, to October 24, 1939? A. Fifteen dollars a week.

"Q. You charge you quit working January 16th, 1940. Was that the last time you worked there? A. Yes.

"Q. I will ask you to state whether or not you worked constantly from October 24, 1938, until January 16, 1940, for Mr. Johnson? A. Yes.

"Q. During that time you were paid fifteen dollars per week? A. That is right."

Wyman further testified that his duties consisted of buying and selling; that he bought farm machinery, tools, furniture and junk of all kinds. Harvey G. Carnes testified that he worked for the defendant at his place of business from October, 1938, until June 16, 1941; that during that time he bought junk, helped clean metals, sorted and piled old iron and sold merchandise; that he was paid $9.00 per week, later $11.00 per week and then $12.00 per week. In his evidence he stated the period of time he was paid the various amounts, also the period of time he worked sixty-six hours ██ per week and seventy-seven hours per week. Orville Sanners testified that he received $10.00 per week the entire time he worked for Johnson; that for certain periods of time he worked seventy-seven hours per week and at other times sixty-six hours per week; that it was his duty to work every other Sunday; that he was so engaged from October, 1938, to April 19, 1941. Sanners testified that he used a car and trailer to deliver merchandise sold from defendant's place of business and also, "I helped unload scrap iron and helped check the weights of the metals that were sold and some of the iron, also followed the truck when the metals were trucked. I used my car to follow the truck. See that there was nothing missing between the store

and the plant." Olive Rose Sanners was employed by Johnson as a bookkeeper. She testified that she kept books for the defendant from February 17, 1940, to April 21, 1941. In her testimony she particularized as to the number of hours she worked per week and the amount paid her. This witness also testified that she kept the records required to be kept by the Social Security Department; that it was from those records and the books she kept at the office that the hours of work upon which plaintiffs' claims were based were determined. Evidence of other claimants was similar. We think we have demonstrated that substantial evidence was introduced to support the finding of the court as to the number of weeks and hours each claimant worked for the defendant.

Defendant was not at all definite in his evidence as to the number of hours his employees were required to work. Note only a few excerpts from his evidence to illustrate:

"Q. What time did he put in at lunch? A. They would stay anywhere from a half an hour to three hours.

"Q. Who do you mean by 'they'? A. That means the whole bunch that worked there, all of them.

"Q. Since we are speaking of all of them, what time of the day did they quit work, we will say in the winter times? A. Well, we sometimes quit early. If it was dark and cloudy or snowy and cold, sometimes I closed up there at four o'clock.

"Q. How often did you do that? A. Any time in the winter time when it turned dark. It turned dark early we would close up whenever it got so no customers come, bad weather, any day it was cloudy, was not anything going on; instead of sitting around the office I would say, 'let us go home,' closed up and go home.

"Q. Did you have any regular hours for them to report in the mornings? A. No, sir, whoever got there first would come up to the house and get the keys and go down and unlock. No certain hours, whoever got there first would come and get the keys and unlock.

"Q. What about closing time? A. If I was not there, they closed up whenever they wanted, take the keys and came up to the house.

"Q. How often would that happen? A. Lots of times.

"Q. Can you average it, about how many times a week, a month? A. No, sir, I couldn't."

With reference to working on Sundays the defendant testified as follows:

"Q. When a customer came in and wanted to buy furniture on Sunday you would sell it to them? A. I didn't sell any.

"Q. Anybody down there would sell it? A. Yes.

"Q. That could sell anything anybody wanted to sell? A. Yes.

"Q. You gave them money on Sunday to make purchases, the same as you would on any other day, you gave them change? A. Yes."

"Q. Give Henry Norton money to buy on Sunday? A. Yes, sir.

"Q. Was Henry Norton required to be there on any Sundays? A. Didn't have to be there.

"Q. Did you know he claimed to be there on every other Sunday? A. He come every other Sunday. Sometimes come every Sunday. Every one of them come on Sunday."

Appellant elsewhere in his evidence stated that none of his employees were required to work on Sundays, but that they gathered at his place of business and used it as a loafing place and if a customer happened to come in the store they would wait on him. Defendant also testified as to certain of his employees being absent from work for various reasons and that Orville Sanners performed duties connected with defendant's agricultural operations. The trial court evidently took that evidence into consideration as the judgment reflects that Shaffer, Wyman and Orville Sanners were not given the amounts they claimed were due. William Heinson did not appear and his claim was dismissed without prejudice.

The trial court computed the amounts due claimants under the following provisions of the Fair Labor Standards Act:

"206. (a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

"(1) during the first year from the effective date of this section, not less than 25 cents an hour,

"(2) during the next six years from such date, not less than 30 cents an hour.

"207. (a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Section 216 (b) of the act provides that in case an employer violates the above section then the employee may recover as liquidated damages a sum equal to the amount of unpaid wages. The section also provides for the allowance of a reasonable attorneys' fee. Appellant, however, insists that his business cannot be classified as coming within the terms of the acts because he was not engaged in interstate commerce and his employees were not so engaged. It is well settled now that if a substantial portion of an employee's activities relates to goods whose movement in the channels of interstate commerce is es-

tablished, then the employee is protected by the Fair Labor Standards Act. See Ashenford v. L. Yukon & Sons Produce Co. (Mo. App.), 172 S. W. (2d) 881, l. c. 886 (5) etc., where in an opinion by Cave, J., the question before us was fully discussed and many cases considered and cited. See also Walling v. Jacksonville Paper Co., 317 U. S. 564, 63 S. Ct. 332, 87 Law Ed. 393. The vital question is, does the evidence in the record justify a finding that a substantial portion of defendant's business and of course the duties of his employees pertain to goods to be transported in interstate commerce? Claimants testified that old cars and machinery were purchased and some repaired and sold to customers, many of whom were from Kansas; that on such transactions no state sales tax was collected. Other old cars and machinery were reduced to junk and segregated. This junk or scrap iron was sold to I. J. Cohen whose place of business was located in Kansas. Thomas Cohen, connected with that business, testified that during the months of August, September and November of 1938, about $1,700.00 worth of scrap iron was purchased from the defendant; that during the year 1939, over $4,000.00 worth was purchased and in 1940, the sales amounted to over $2,700.00. A great portion of this scrap iron Cohen resold to Sheffield Steel Corporation where it was melted and shipped to various points in the United States. J. W. Moore, connected with Sonken-Galamba Corporation, located in Kansas, an operator of a smelting refinery, testified that in March, 1941, $5,472.60 worth of metals were purchased from the defendant. The defendant claimed that this metal had accumulated at his place of business in the course of a number of years. Plaintiffs by their evidence disclosed that much of the merchandise sold at the store went to Kansas. The defendant contended that the employees were instructed to collect sales tax on every sale; that goods were sold and delivered from his place of business in Kansas City, Missouri, and if taken to Kansas that was done by the customers and not the defendant and therefore the sales were not interstate commerce. A witness for the defendant, whose business was trucking, testified on cross-examination as follows:

"Q. (By Mr. Shapiro) Do you have anyone in particular you contract hauls for regularly? A. Mr. Johnson.

"Q. That is exactly what I wanted to know. Mr. Johnson is the man who arranges to bring you and a customer together, and you and the customer agree on the price for the haul? A. Not always there.

"Q. When you are there? A. Any of the help, anybody.

"Q. Then you and the customer agree on a price of the haul, is that right? A. Sometimes.

"Q. You always agree on the price of a haul, don't you? A. Certainly.

"Q. You have delivered and hauled stuff out of the Johnson Everything Store in Wyandotte and Johnson County, and in Kansas

City, Kansas, in all these territories, haven't you, just answer it yes or no, haven't you? A. I have done what?

"Q. You have delivered stuff that came out of the Johnson Everything Store to places in Wyandotte County and in Johnson County over in Kansas City, Kansas? A. Yes."

Appellant also contends that his place of business is a retail establishment and is exempt from the Fair Labor Standards Act because of section 213 thereof which exempts "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." The evidence does not show that the greater portion of the defendant's sales constituted Missouri business, but aside from that a very substantial portion of defendant's business was the dealing in junk of all kinds, scrap iron and metals which were shipped and sold in wholesale lots to plants outside of the state, and it was shown that these products actually went into interstate commerce and were intended to so go. A great portion of the claimants' duties were connected with that business and therefore such employees were protected by the act in question. See Walling v. Jacksonville Paper Co., 87 L. Ed. 393, 1. c. 398 (6); Kirschbaum Co. v. Walling, 62 Sup. Ct. 1116, 86 L. Ed. 1638, 1. c. 1647 (5). In the latter case the Supreme Court of the United States considered the question of the scope of the Fair Labor Standards Act and particularly the following from section 207 (a) when applied to employees: ". . . engaged in commerce or in the production of goods for commerce." The court also considered the following from section 203 (j):

". . . for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed . . . in any process or occupation necessary to the production thereof, in any State."

The employees in the Kirschbaum case were engaged in the maintenance of a building in which goods for interstate commerce were produced. The employees were janitors and firemen. They were not employees of the producer of the goods but of the owner of the building which was rented by the producer. If such employees are to be considered as coming within the scope of the act then certainly claimants in this case, who handled products such as scrap iron, metals and junk, must be considered as coming within the scope of the act. The buying of the scrap and junk, segregating it, breaking it up, keeping the books in connection therewith and other labor necessary to the handling thereof comes directly within the definition contained in section 203 (j) of the act as follows:

"'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State."

We rule, therefore, that the evidence was sufficient to sustain the finding of the court that the employees were protected by the act in question.

Appellant insists that the trial court erred in allowing claimants attorneys' fees because there was no evidence as to the value of the attorneys' labor in the preparation and conduct of the case. The court's allowance of $1,000.00 was not unreasonable. A trial court trying a case of this nature certainly is in a position to understand and fairly estimate the amount of labor necessary to prepare the case for trial. The following is all we find in the record with reference to this question:

"Mr. Shapiro: Will you agree if plaintiff is entitled to recover attorney's fees, $1,500 is a reasonable attorney's fee, if we are entitled to a judgment?

"Mr. Swearingen: I can't agree until we hear the testimony.

"The Court: Would you agree (and it would be a very liberal agreement) if recovery was had for approximately $7,500, actual recovery, a penalty of $1,500 would be a reasonable fee, and if the recovery would be less, it would be proportionate to that.

"Mr. Swearingen: The amount of the fee will be in proportion to the final recovery, that is, as to the $1,500?

"Mr. Shapiro: That is all right.

"The Court: We will now adjourn until 9:30 o'clock tomorrow morning."

These comments between the attorneys and the court could be interpreted as an agreement. However, that is not necessary because courts are themselves experts on the question of attorneys' fees and the judge who personally tries a case and is acquainted with all the issues involved is in a position to fix the amount of attorneys' fees without the aid of evidence. Blackhurst v. Johnson, 8th Circuit, 72 Fed. (2d) 644, l. c. 648 (15-18). The point is ruled against appellant. What we have said disposes of all the points preserved for review.

The judgment is affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.