**Frank P. SEBREE, Administrator With Will Annexed of the Estate of Sarah Rosen, Deceased, et al., Respondents,**

**v.**

**Jacob ROSEN, as Executor of the Estate of Pete Rosen, Deceased, Betty Rosen, Sue Hyken, Carl R. Hyken, Mary Bodney, Bernard Bodney, and Sam Rosen, Appellants.**

**No. 50688.**

Supreme Court of Missouri,

Division No. 1.

Sept. 13, 1965.

Terence M. O'Brien, Daniel S. Millman, Hoskins, King, Springer & McGannon, Kansas City, respondents pro se.

Arthur J. Kase, Kansas City, for appellants.

WALTER H. BOHLING, Special Commissioner.

This is an appeal from a judgment awarding $25,000 to Daniel S. Millman and Terence M. O'Brien for legal services to the "Rosen Trust" from September 12, 1961, through July 19, 1963, other than Tax Court service; and $4,175 to Hoskins, King, Springer and McGannon, and said Millman and O'Brien for legal services to said trust in certain Tax Court cases from January 1, 1962, through May 25, 1962. This appeal, the third involving Rosen property (Sebree v. Rosen, Mo., 349 S.W.2d 865, and 374 S.W.2d 132), was taken by Jacob Rosen, Betty Rosen (Jacob's wife), Sue Hyken, Carl S. Hyken (Sue's husband), Mary Bodney, Bernard Bodney (Mary's husband), and Sam Rosen. An outline of the background of this litigation may be helpful in understanding the issues.

Pete Rosen and Sarah, his wife, created the Rosen trust May 22, 1952, and thereafter added thereto. It consisted of real property vested in the settlors by the entirety. Their name, originally Rosenwasser, had been changed to Rosen. They were the parents of Meyer (who retained the family name), Rose, Morris, Jacob, Sue, Mary and Samuel, being all of the surviving children (heirs at law and primary beneficiaries of said trust) and parties plaintiff or defendant herein.

The net income of the trust estate was reserved to the settlors for their joint lives, passed to the surviving settlor for life, and then, first, said income for twenty years and thereafter the corpus was to be distributed to the settlors' children as follows: Jacob, 30%; Morris, 15%; Sue, 15%; Mary, 15%; Meyer, 10%; Samuel, 5%; and Rose, 10%. The trust instrument named Pete and Jacob joint trustees; the survivor, sole trustee; and City National Bank and Trust Company, of Kansas City, Missouri, successor trustee. Pete died June 14, 1954, aged 71 years, and Sarah, 74, died November 17, 1954. See 349 S.W.2d 870, 871.

In 1955 Morris, Rose, who had married Morris Silverman, Meyer (known as plaintiff-beneficiaries) and Frank P. Sebree, Administrator with will annexed of the Estate of Sarah Rosen, Deceased, instituted a suit in fourteen counts involving said trust estate and transactions between said settlors and their children. The principal defendants were Jacob, Sue, Mary and Sam, who had a 65% interest in the net income and residue of said trust and were represented by attorneys Arthur J. Kase and Walter Raymond. The plaintiff-beneficiaries, having the remaining 35% interest in said income and residue, and Frank P. Sebree, as administrator aforesaid, were represented by O'Brien and Millman. Other parties to the litigation need not be specifically mentioned.

Count III of the original suit, in the alternative if the Rosen trust be held valid, sought, briefly stated, among other things, an accounting covering the actions of the trustees and the removal of the survivor

trustee, Jacob Rosen. The decree, entered October 6, 1958, among other things, upheld the trust, removed Jacob as survivor trustee on the ground his administration of the trust had resulted in a bitter schism within the family and, in accord with the trust instrument, named City National Bank and Trust Company, of Kansas City, Missouri, successor trustee. We affirmed; and, in addition, considered Jacob had breached his trust in several respects, and any compensation allowed him as trustee should be conditioned upon his making good all losses he caused the trust. 349 S.W.2d l. c. 885 (III). The decree on Count III was stayed pending appeal under supersedeas order and bond.

The City National Bank and Trust Company, herein also referred to interchangeably as Bank or Successor Trustee, through its trust officers, was hesitant to accept said appointment as trustee. It wanted to know fully what was involved, questioned many things, and wanted to be clear of all problems created by the Removed Trustee. Its general counsel advised against accepting said trust prior to the completion of the Removed Trustee's accounting. The Bank knew of Millman's and O'Brien's activities in the Rosen property litigation and wanted the benefit of their knowledge of the situations as its representative in the Removed Trustee's accounting. Millman and O'Brien knew the Bank had been named successor trustee by the settlors and the trial court, and considered it important that the Bank be prevailed upon to accept the appointment. There is an indication of record that defendant beneficiaries and counsel preferred another bank for the successor trusteeship. Our opinion in Sebree v. Rosen, supra, was handed down September 11, 1961, and became final October 11, 1961. Beginning September 12, 1961, or soon thereafter Millman and O'Brien had many conferences with officials of the Bank, went over the pleadings, the exhibits and the various issues involved in the Sebree v. Rosen litigation, and discussed and explained the situations to said officials. They assured the Bank that if it accepted the trusteeship they would review the Sebree v. Rosen issues, and would secure a definite and final adjudication of the assets and liabilities as of the time the bank took over to the end that it would not be troubled with what had happened theretofore.

The Bank addressed a letter, dated October 26, 1961, to the attorneys for the defendants, Mr. Raymond and Mr. Kase, and for the plaintiffs, Mr. Millman and Mr. O'Brien, and forwarded a copy to Judge J. Donald Murphy, who had retained jurisdiction over the proceedings. The letter set forth certain conditions under which the Bank was willing to accept the Successor Trusteeship. It stated: " * * * it is necessary that the instant court proceedings result in a full and final judicial settlement of all accounts and transactions of the predecessor Trustee." This, we understand, contemplated a final adjudication as to the liability of the Removed Trustee; what the assets and liabilities of the trust were, each separated as to principal and income; and what, if any, undistributed income the trust owed and to whom. The letter also stated the Bank desired to confer with all of the adult beneficiaries of the trust; believed "that the Court proceedings and other matters pertaining to the accounting to be made by" the Removed Trustee should be handled by the attorneys participating in the original suit, and desired an agreement between all the beneficiaries on the attorney to represent it after the conclusion of the accounting and matters pertaining to the litigation.

Representatives of the Bank met with the attorneys for the plaintiffs and for the defendants and also with the beneficiaries personally. All the beneficiaries, plaintiffs and defendants, agreed through their attorneys to the Bank becoming Successor Trustee and to the conditions it imposed.

I. At a conference with the Bank sometime after its letter of October 26 and prior to the hereinafter mentioned decree

of December 22, 1961, attended by Kase and Raymond for the defendants and Millman and O'Brien for the plaintiffs, it was agreed that Millman and O'Brien would represent the Successor Trustee until the accounting and the exceptions thereto were completed; and thereafter A. E. Margolin would represent said Trustee. No restrictions were placed on Millman's and O'Brien's representation of said trustee during the completion of the accounting. This agreement was never reduced to writing. O'Brien and Millman testified to the above effect, and were supported by statements by Mr. Margolin, who appeared on behalf of the Successor Trustee at the hearing.

■ There was a conflict between respondents' and Mr. Kase's testimony. He testified the Bank was unwilling to act as trustee unless the attorneys in the original suit would work together for a successful accounting; that under the agreement it would use Millman and O'Brien to represent it only for the purpose of the accounting; and that all the attorneys would receive compensation from the trust for their services in and their activities would be limited to the accounting. Mr. Margolin, for the Successor Trustee, offered no witness at the hearing. Mr. Raymond, an attorney for the defendant-beneficiaries with Mr. Kase, was not called to testify. This failure to call witnesses connected with the Successor Trustee or defendant-beneficiaries who knew about the agreement and respondents' activities "raises a strong presumption and inference that the evidence of such persons" would have been unfavorable to the defense. Ewing v. McIntosh, 359 Mo. 625, 222 S.W.2d 738, 741 [1]; Irle v. Irle, Mo.App., 284 S.W.2d 44, 47 [3, 4]. The trial Chancellor was familiar with and had personal knowledge of many of the facts involved and due deference is to be given his findings. The preponderance of the evidence is in favor of respondents, and additional factual situations sustain this conclusion.

Millman and O'Brien continued their conferences with officials of the Bank and their efforts to have it act as Successor Trustee. They drafted the "Separate Supplemental Judgment and Decree on Count III" that the original decree of 1958 might conform with the holdings in 349 S.W.2d 865 on said Count. Said decree was drafted and redrafted before it met the approval of everybody, and was entered December 22, 1961, and had the approval of the attorneys for the defendants and the plaintiffs.

The Bank accepted its appointment as Successor Trustee on December 22, 1961, the accounting to be completed later.

This supplemental decree, among other things, required the Removed Trustee to deliver to the Successor Trustee on December 31, 1961, all the assets, books and records of the trust, which we understand were turned over on January 2, 1962; required the Successor Trustee to commence its administration on January 1, 1962; required the Removed Trustee to file his accounting and deliver to the Successor Trustee all cancelled checks, paid invoices, receipted bills and vouchers of the trust within thirty days; required any exceptions to said accounting to be filed within thirty days; and provided that such delivery and acceptance of said assets, books, records, checks, invoices, bills and vouchers should not prejudice any right or claim of the Removed Trustee, the Successor Trustee or any party to the action other than that the Removed Trustee should receive credit for the specific items so delivered. The Chancellor retained jurisdiction to enforce the provisions of said decree.

We briefly mention some of the legal services requested of and performed by respondents on nonaccounting matters, not including legal research, opinions and conferences in connection with situations arising in the day to day administration of the trust.

In January 1962, respondents reviewed the record in the Bodney partition suit and secured the payment of $22,000, the trust's

portion, to the trustee, and a refund of half the costs by other litigants. They, upon request, also advised the Bank said $22,000 was returnable for income taxes in the year actually received although constructively received earlier.

Respondents handled the legal matters connected with the sale of an apartment building at 40th and Main, getting tenants to vacate, pay their rent and approval of the sale by the court.

The St. Regis Hotel property, purchased and operated by the Removed Trustee, was heavily mortgaged, but the trust was not liable thereunder. Threatened with foreclosure in March 1962, the Successor Trustee decided it could not wait for the Removed Trustee's accounting, had respondents make the necessary legal research and application and, after notice to Kase and Raymond, secured authority to abandon said property and make no further payments on the mortgages. Respondents represented the Successor Trustee at the foreclosure sale. There was a question whether a chattel mortgage covered after acquired personal property, and respondents secured the payment of $500 from the purchaser at the foreclosure for such personal property. They also assisted in the collection of back rents and the adjustment of prepaid rents.

Respondents rendered legal services in the collection of $1,750 back rent from the Kaufmann Window Shade Company, a tenant of trust property and about to take bankruptcy.

Respondents also rendered legal services in connection with the sale of 1802 W. 39th St. to Morris and Rose Silverman, owners of the other half, for $9,500.

Respondents arranged for a title search on all the real estate owned by the trust; resolved the problem involved in the administration of real estate owned by the trust in Kansas; and performed other nonaccounting legal services for the trust estate.

Such additional facts as are considered necessary will be developed in the course of the opinion.

II. Appellants make the point that respondents "were employed by and representing the estate of Sarah Rosen, whose interest was and is in conflict with the interests of the Rosen trust"; and contend said attorneys are not entitled to any fees from the Rosen trust.

The settlors, as husband and wife, acquired title under separate conveyances to two adjoining Woodland Avenue tracts in Kansas City, Missouri. One-half of this real estate was improved, but the other half was not. With the Successor Trustee's exceptions about ready for filing, its trust department discovered in investigating Rosen tax bills that the improved half of said property had not been conveyed to the trust although it had been administered upon from the beginning. Accordingly, the exceptions were redrafted to present this situation to the court and filed January 18, 1963. In the course of the proceedings the court was asked to declare the improved half a part of the Rosen trust.

Exceptions filed January 28, 1963, of Frank P. Sebree, administrator aforesaid, claimed said improved half, the undistributed income therefrom, and that certain undistributed trust income had not been paid Sarah Rosen during her lifetime.

We are in accord with the provisions of Civil Rule 4.06, V.A.M.R., on "Adverse Influences and Conflicting Interests." Moffett Bros. Partnership Est. v. Moffett, 345 Mo. 741, 137 S.W.2d 507 [1-3]. However, we find appellants' position not well taken under this record.

■ All had constructive notice that the Woodland Avenue improved tract was not included in the conveyance to the trust; and when respondents presented that situation to the court at the direction of the Successor Trustee in its exceptions, their client published said fact to the parties interested in this trust estate. Said excep-

tions on behalf of the Sarah Rosen estate were filed ten days after the filing of said Successor Trustee's exceptions. We find no violation of any confidences of the Successor Trustee by respondents.

Prior to any agreement respecting the attorneys for the Successor Trustee, the Bank was fully informed and knew that Millman and O'Brien had been and were still representing the plaintiffs, and that Raymond and Kase had been and were still representing the defendants in the Sebree v. Rosen litigation. This record is to the effect that the attorneys would continue to represent their respective clients. Appellants' evidence was that notwithstanding the existing relationship between the attorneys and the different litigants, the Bank was unwilling to accept the trusteeship unless the attorneys agreed to work together; that respondents would represent the Bank as Successor Trustee and Raymond and Kase would represent the Removed Trustee, and the attorneys would receive compensation from the trust.

A. E. Margolin succeeded respondents as attorney for the Successor Trustee under the agreement with the decree of July 19, 1963. Respondents, securing leave, have filed a transcript of proceedings resulting in a supplemental decree of September 9, 1964, ruling the issues involved in appellants' complaint under this point, the court having in prior decrees retained jurisdiction to later adjudicate said issues. Consult Phelps v. Cape Girardeau W. W. & El. L. Co., 165 Mo.App. 454, 463, 147 S.W. 130, 133 [1] and cases cited. Said transcript shows that, after an uncontested hearing wherein the trust was represented by Mr. Margolin, the court reformed the trust instrument, vested title to the improved Woodland tract in the trust as of the date of its declaration, May 22, 1952, and determined that the trust owed the Sarah Rosen, deceased, estate $9,833.58, with interest, for unpaid trust income between June 14, 1954, the date of her husband's death, and November 17, 1954, the date of her death, as the surviving settlor income beneficiary.

■ Respondents told the Successor Trustee several times to get other lawyers if it thought peace would be better served, and in such instances A. E. Margolin was selected, in some matters prior to the adjudication on the accounting. Mr. Margolin, at the hearing on respondents' application, stated: "I am not suggesting a conflict of interest." Raymond and Kase, attorneys for the defendant-beneficiaries, well knew that respondents had been and were representing the plaintiff-beneficiaries when they admittedly agreed for respondents to represent the Successor Trustee through the accounting. The answer of the Removed Trustee to the exceptions to his accounting established conflicts of interests with the interests of the trust. However, Raymond and Kase accepted payment from the trust for their services on behalf of the Removed Trustee. No motion to enjoin respondents from representing the Successor Trustee was filed by said Trustee or on behalf of the clients of Raymond and Kase. The Successor Trustee made no contention that respondents were representing conflicting interests or had violated any confidences. It filed no motion for new trial. Its action supports an admission that prior to the agreement for the payment of attorney fees it had been fully advised of the relationship between the several attorneys and the parties to the Sebree v. Rosen litigation. This "conflict of interest" issue was first presented in appellants' motion for new trial. The record warrants a finding that appellants took their chances for a satisfactory result and upon being disappointed (apparently with the amount rather than the fact of an allowance) presented this "conflict of interest" issue for court action. In these circumstances appellants waived any right they may have had under said issue. State v. Howard, 118 Mo. 127, 24 S.W. 41, 43(4); Michel v. McKenna, 199 Wis. 608, 227 N.W. 396 [5, 6]; Harvey v. Harvey, 202 Wis. 553, 231 N.W. 580 [6]; Deupree v. Gar-

nett, Okl., 277 P.2d 168 [4, 7]; Lee v. Zaske, 213 Minn. 244, 6 N.W.2d 793 [6]; 7 C.J.S. Attorney and Client § 48, p. 829; 7 Am.Jur.2d, Attorneys at Law, § 157; Annotation, 52 A.L.R.2d 1268 § 9. It also has been stated that only the party who has been a client of the attorney may complain of his conduct. 7 C.J.S. supra; Michel case, supra [2]. State v. Burns, Mo., 322 S.W.2d 736, 740 [6], is distinguishable on the facts and issues.

III. The court allowed respondents compensation for legal services (other than tax court services) between September 12, 1961, and the decree of July 19, 1963, on the exceptions to the Removed Trustee's account. Sebree v. Rosen, 349 S.W.2d 865, was handed down September 11, 1961. Appellants claim the court erred in taking into consideration services by respondents prior to the Bank accepting this trusteeship on December 22, 1961, citing Selleck v. Hawley, 331 Mo. 1038, 56 S.W.2d 387, 395 [15], to the effect a trustee's powers and duties begin when he accepts the trust. Respondents say their services between September 12 and December 22, 1961, benefitted the trust and are for consideration.

■ The Successor Trustee, prior to accepting this trust, secured an agreement covering the attorneys for the trustee. We think the Chancellor could find that certain legal services performed by respondents prior to December 22, 1961, including the drafting and redrafting of the decree entered on December 22, 1961, were knowingly accepted and taken advantage of on behalf of the trust. The settlors expressly authorized the trustee to employ counsel (see 349 S.W.2d l.c. 891 [49, 50]). In this case the former trustee stood removed and his appointed successor, named by the settlors, was hesitant in accepting the trust. The Selleck case does not establish prejudicial error in the unusual circumstances of this case. We conclude the Chancellor could consider so much of the questioned services as he found beneficial to the trust. Taussig v. St. Louis &

K. Ry. Co., 166 Mo. 28, 65 S.W. 969 [1, 2], 89 Am.St.Rep. 674; Boyd v. Chicago & A. Rd. Co., 84 Mo. 615; 7 C.J.S. Attorney and Client § 175, p. 1042.

IV. The Chancellor found that respondents, between September 12, 1961, and July 19, 1963, rendered legal services, other than tax court services, at the request, on behalf of and for the benefit of the Rosen trust; that said services were reasonably worth $25,000, benefitted said trust to that extent, and awarded respondents $25,000 therefor.

■ Upon accepting the Successor Trusteeship on December 22, 1961, the Bank employed Millman and O'Brien as attorneys for the trustee. There was no agreement respecting their compensation, and respondents' claim lies in quantum meruit. Mecartney v. Guardian Trs. Co., 274 Mo. 224, 202 S.W. 1131 [5, 6]; Bennett v. Adams, Mo.App., 362 S.W.2d 277, 281.

Mr. Millman and Mr. O'Brien attached to their application separate time schedules covering their legal services, excluding tax court services, for the Rosen trust between September 12, 1961, through July 19, 1963. Each testified said application and his time schedule was true and correct, and involved problems of the trustee. O'Brien's and Millman's said schedules show 704 and 674⅓ hours, respectively, of legal services to the trust—a total of 1,378 hours. There was testimony that the Bank performed the trustee and accounting services and that Millman and O'Brien performed legal services and avoided duplication of work.

O'Brien and Millman testified the fair and reasonable value of said services was $34,000, as did Harry L. Jacobs and James P. Aylward, who were admittedly eminently qualified by appellants' counsel, Mr. Kase. The Kansas City Bar Association has established a *minimum* fee of $25 an hour for services of this nature. Mr. Margolin stated the Bank had reviewed respondents' application and had no reason to question the time involved as to the various matters,

and the Bank's experience was that $20 to $25 an hour was reasonable. Mr. Kase stated $20 or $25 an hour was fair; that he had no argument about the accuracy of the time sheets, but questioned whether the time was wisely spent on behalf of the trust. Consult S.Ct.Rule 4.12, V.A.M.R.

Appellants now claim $25,000 is excessive in that it included compensation for services never shown to be necessary for, requested by, or of benefit to the Rosen trust. Their presentation is that Terence O'Brien claimed 44 hours of legal research on the Removed Trustee's failure to account, an excessive number of hours, in March and April, 1962, and 126½ hours of legal research between June 5 and October 17, 1962, with no explanation as to questions involved.

Appellants relate the 44 hour item to: "March 22—5 hours; March 30—7 hours; April 2—7½ hours; April 4—7½ hours; April 10—6 hours, and April 11—7 hours." We reach a total of 40 hours.

The supplemental decree of December 22, 1961, as stated, required the Removed Trustee to file his accounting within 30 days; that is, on or about January 21, 1962. (We mention here that the supplemental decree of July 19, 1963, on the exceptions to the Removed Trustee's accounting found that the accounting of the Removed Trustee was "inadequate and insufficient.") No accounting was filed. Following complaint by respondents, Removed Trustee's attorneys applied for and secured permission to file his accounting on or before March 1, 1962. Again, the accounting was not filed. On April 10, 1962, the Bank filed its report that the Removed Trustee had failed to file his accounting as directed and asked for instructions thereon. On April 11, 1962, at a hearing on the last-mentioned filing, the Removed Trustee deposited with the clerk of the court "a vast conglomeration of records"—cancelled checks, bank statements, invoices et cetera, and a paper referring thereto. On April 18, 1962, the Removed Trustee filed a paper captioned "Account-ing of Removed Trustee." On May 3, 1962, the Bank filed an application to reject said purported accountings of April 11 and April 18. At a hearing on May 4, said application to reject was continued for thirty days.

These failures of the Removed Trustee to file a proper accounting delayed a final adjudication on his accounting, handicapped and impeded the Bank's administration of the trust, and brought on administrative problems, which were referred to respondents for legal opinions and conferences with trust officials of the bank.

Other portions of this record indicate that at least part of the 7½ hours of March 30 was concerned with the advisability of citing the Removed Trustee for contempt and the preparation of a motion to that end, which motion was not filed; and that part of the 7½ hours of April 4 was concerned with payments on mortgages against the St. Regis Hotel.

Satisfied the Removed Trustee did not intend to file a proper accounting and in an effort to accomplish something, the Bank and respondents decided to examine the records delivered to the clerk of the court to determine whether proper exceptions could be arrived at therefrom and to not stand on their rights under the decree of December 22, 1961. Respondents had the responsibility of overseeing the analysis of the records submitted by the Removed Trustee to the end that all breaches of trust by him be presented to the court and for the protection of the Successor Trustee in its administration of the trust.

We understand the Removed Trustee reported that he had trust assets valued at $547,000 on June 14, 1954, the date of his co-trustee's death, that up to his removal on December 31, 1961, he had gross receipts of over $1,000,000; that he claimed credit for disbursements of over $902,000, with court approval for only $47,000; and, according to his report, he turned over to the Successor Trustee assets valued at $727,000.

The Bank on May 17, 1962, received from the clerk of the court the "conglomeration of records" deposited by the Removed Trustee and issued its receipt therefor, which consisted of seven legal sized pages of single spaced typewriting. Between May 1962, and sometime in January 1963, respondents were engaged in reviewing said records and making legal research to determine which of said transactions and other transactions respondents knew about should be included in their exceptions. Many of the problems were complex and difficult. Respondents would prepare rough drafts of exceptions, have conferences and review them with trust officers of the Bank, and revise and redraft the exceptions. Said exceptions, consisting of twenty-nine legal sized sheets of double spaced typewriting, were filed January 18, 1963 and set for trial on June 17, 1963. Millman prepared a trial brief and O'Brien interviewed the witnesses. There was an indication that the Removed Trustee would be interested in settling the exceptions. The lawyers, including Mr. Margolin, worked on a decree which finally no one opposed and which was entered during Judge J. Donald Murphy's absence by Judge Harry A. Hall on July 19, 1963.

The decree surcharged the Removed Trustee $45,000, which he paid; and, among other holdings, ruled on what receipts and what disbursements were to be placed under principal and under income.

■ Appellants' presentation involving the 126½ hours is a lump sum presentation and does not point out the specific items appellants have in mind. From our review of other portions of the record we think it is to be inferred that the legal research involved related to matters connected with the exceptions to the Removed Trustee's accounting. We are in accord with the observation in Jesser v. Mayfair Hotel, Inc., Mo., 360 S.W.2d 652, 664, to the effect that attorneys are not required "to select the precise issue upon which they will ultimately prevail and to reject all others, or to ad-

duce the exact amount of evidence needed and no more." Judgments should not be set aside unless clearly erroneous. S.Ct.Rule 73.01(d), V.A.M.R.; § 510.310(4), RSMo 1959, V.A.M.S.

■ The burden was on appellants to affirmatively establish that the compensation allowed the respondents was a clear or manifest abuse of sound judicial discretion. Rochester v. Gonterman, Mo., 49 S.W.2d 71 [1]; James v. James, Mo., 248 S.W.2d 623 [8]; Jesser case, supra [15].

■ We have considered judges to be experts on the question of attorney fees and that a judge who tries a case and is acquainted with all the issues involved may "fix the amount of attorneys' fees without the aid of evidence." Agnew v. Johnson, 352 Mo. 222, 176 S.W.2d 489 [6]; Flynn v. First Nat. Safe Deposit Co., Mo., 284 S.W. 2d 593 [9].

Judge J. Donald Murphy presided over the trial of the two cases involving Rosen property that reached this court upon appeal and, excepting the agreed upon decree, over proceedings involved in respondents' application. Respondents or one of them appeared before him on about twenty-three occasions in performing services for this trust. The situation is similar to that in Donaldson v. Allen, 213 Mo. 293, 111 S.W. 1128 [1], where it is stated: " * * * the judge deciding the point presumptively knew the character of the services rendered in duration, zeal, and ability. He presumptively knew the value of them according to custom, place, and circumstance. * * * In this view of the matter, there is room for a most violent presumption that the trial court did not err in gauging the quantum of the fee." Jesser case, supra.

■ There is no question about respondents' legal services benefitting the trust. In the absence of evidence to the contrary it is presumed that the allowance for attorney fees was for compensable services (Sutliff v. Montgomery, 115 Mo.

App. 592, 92 S.W. 515 [5] ); and that no allowance was made for noncompensable services (Sullivan v. Winer, Mo.App., 307 S.W.2d 704 [9]). In Pickel v. Pickel, Mo. App., 179 S.W. 949 [1], an allowance of a lump sum for attorney fees, involving numerous items some of which were proper and others may not have been, was upheld on the presumption of right action by the trial court where the record did not disclose the items rejected or allowed. See also Carmack v. Dade County, 127 Mo. 527, 30 S.W. 162.

Schlanger v. Simon, Mo., 339 S.W.2d 825, 828 [3], states: "An appellate court should not become an advocate of one of the parties, and therefore it is not the duty of an appellate court to search the evidence in an effort to find some theory, and facts in support thereof, to establish a general assertion that the trial court reached the wrong result." Morris v. Willis, Mo., 338 S.W.2d 777 [7], states: "It is not the duty or function of appellate courts to brief points made in an appellant's brief." Whiteaker v. Chicago, R. I. & P. R. Co., 252 Mo. 438, 160 S.W. 1009, 1015 [11].

■ The evidence established a minimum fee for services of the nature rendered by respondents of $25 an hour. Respondents claimed a total of 1,378 hours of legal service to the trust. Appellants' presentation does not establish prejudicial error.

V. The Chancellor awarded Hoskins, King, Springer and McGannon, Daniel S. Millman and Terence M. O'Brien $4,175 for legal services in the Federal Estate Tax court cases for the Rosen trust from January 1, 1962, through May 25, 1962, on findings that said services "were rendered on behalf of and for the benefit of the Rosen Trust and * * * were reasonably worth $4,175.00 to the Rosen Trust and benefitted it to that extent."

Appellants in their argument contend respondents are not entitled to said $4,175 because they did not procure and file the power of attorney called for by 6 C.C.H.

Standard Federal Tax Reporter, 1964 page 67198, ¶ 6013C(c) (1) (see 26 C.F.R. § 601.-502(c) (1)), and were incapable of serving the trust. Said ¶ 6013C(c) (1), in part, reads: "Except as otherwise provided in this section, no attorney or agent shall appear on behalf of any person before any office of the Internal Revenue Service nor shall the attorney or agent be recognized in any matter connected with the presentation of another person's interests, including the preparation and filing of necessary written documents and correspondence with the Service relating to such interests, unless the attorney or agent presents and files a power of attorney in proper form, or a true copy thereof, from the person authorizing the attorney or agent to represent him in the matter in question."

Prior to the Bank accepting the successor trusteeship, Federal estate tax cases involving Rosen property were pending for trial in the United States Tax Court. Two involved the estate of Sarah Rosen, deceased, Frank P. Sebree, administrator. One alleged liability as transferee for a deficiency of $166,560.36 in said taxes owed by the estate of Pete Rosen, deceased. The other alleged primary liability for a deficiency in Federal estate taxes of $440,476.-50. Two, based on transferee liability, involved the Pete and Sarah Rosen trust, Jacob Rosen, trustee. One involved the aforesaid alleged deficiency owed by the estate of Pete Rosen; and the other involved the aforesaid alleged deficiency owed by the estate of Sarah Rosen. Prior to December 22, 1961, Millman, O'Brien and the Hoskins firm, specialists in Federal tax matters, represented the Sarah Rosen estate, and R. Kenneth Cohn represented Jacob Rosen, trustee.

O'Brien informed the Bank of the pendency of these Federal estate tax cases prior to its acceptance of the trusteeship.

In January 1962, O'Brien, in response to a telephone request for a conference on said cases from Mr. Lostutter, an attorney representing the Government, went to Los-

tutter's office. Lostutter wanted to know if the cases could now be settled, Sebree v. Rosen having been decided. O'Brien reviewed the situation generally for Lostutter, informing him Jacob Rosen had been removed as trustee; that the Bank was successor trustee, that Millman and he represented the Sarah Rosen, deceased, estate and the Successor Trustee; and he would check into the situation and submit a settlement proposal. O'Brien asked the Hoskins firm for recommendations on a settlement.

The Hoskins firm considered their services were for the Sarah Rosen estate and for the Rosen trust. They reviewed and analyzed the files and on February 21, 1962, submitted their memorandum of suggestions for settlement to O'Brien.

Charles G. Young, Jr., and Fred A. Lambert, officers in the Bank's trust department, are lawyers. Mr. Young is an executive vice-president of the Bank.

A letter from Mr. Lambert, dated March 8, 1962, to O'Brien, stating he had been informed Millman and O'Brien were looking after the tax court cases, asked for a summary of what was at issue and their present status. On March 20 O'Brien forwarded the requested summary to Lambert, detailing the issues in the Rosen tax proceedings, stating the status of said cases, and advising Lambert of the forthcoming settlement conferences with Lostutter.

Thereafter, without detailing the facts, O'Brien had several conferences with Mr. Lostutter and Mr. Sturm, a trial attorney for the Government. The issues and contentions were discussed. O'Brien was requested to submit certain memorandum and what the proposed settlements meant in dollars and cents. The preparation of some of the exhibits took considerable time. O'Brien kept the Successor Trustee fully advised of the position taken by the Government, the exhibits prepared by respondents for submission to the Government in furtherance of a settlement and their meaning.

A conference was held at the office of Charles G. Young, Jr., in the Bank on May 18, attended by Young, Lambert, Kase, Raymond, Hoskins, Millman and O'Brien. The settlement was discussed. Kase thought the valuations were excessive. The meeting recessed for Kase to put his ideas in writing.

Kase wrote Young May 23, stating the beneficiaries he represented desired that Cohn's "representation of the trust and any other attorneys who may represent the trust on these tax matters terminate as of this date." Young forwarded Kase's letter with a memorandum to O'Brien. O'Brien answered promptly, May 25, stating in part: "The Hoskin's firm and Millman join me in saying to you: Please feel perfectly free to terminate our employment on these matters at any moment you wish. As I have informed you, we will welcome being relieved of responsibility to the trust on these Federal estate tax matters."

Respondents thereupon ceased representing the Successor Trustee in tax court matters. Mr. Margolin started representing said trustee in the settlement negotiations.

Respondents claim in the settlement of the Estate Tax cases they secured agreements between January 1 and May 25, 1962, that Sarah contributed equally with Pete in the acquisition of the jointly held property; as to the fair market value of 34 tracts of real estate and other property, and that the settlors' conveyances to their children were supported by valuable considerations and were not gifts in contemplation of death.

The Hoskins firm, Millman and O'Brien represented the Sarah Rosen estate throughout said proceedings; that is, before, during and also after they represented the Rosen trust and Sarah Rosen's estate from January 1, 1962, through May 25, 1962. We understand that in the settlement of said tax cases said services were taken as an allowable expense item at $25 an hour, which the evidence established as a minimum for such services; that said attorneys

were credited with 514 hours but agreed to accept a total of $12,500 for said services; that said attorneys agreed to accept $8,350 for the 348 hours credited while representing both the Rosen trust and the Sarah Rosen estate, which $8,350 was divided equally between said two clients; that is, $4,175 to each. (We understand the cases involving the deficiency of $440,476.50 were settled for $28,603.61, and that the cases involving the deficiency of $166,560.36 were settled for $33,947.03.)

Mr. Margolin, who succeeded respondents as attorneys for the Successor Trustee, admitted that as the settlement negotiations moved forward "we had to use as tools of the settlement the statistical subjects that had been prepared by other counsel because we did not retread this same ground again"; and he also admitted that the Successor Trustee "did benefit from them."

█ Judicial admissions against interest are conclusive against the party making them in the absence of contradictory evidence. Wehrli v. Wabash Ry. Co., Mo., 315 S.W.2d 765, 774 [10]; Polk v. Missouri-K.-T. Ry. Co., 341 Mo. 1213, 111 S.W. 2d 138, 142 [4], 114 A.L.R. 873, and State ex rel. St. Louis Basket and Box Co. v. Reynolds, 284 Mo. 372, 224 S.W. 401, 403, affirming 200 Mo.App. 568, 207 S.W. 891, 894 [1].

The testimony was that the four tax court cases had to be settled in one package and they could not be settled separately. Respondents' work necessarily benefitted the trust.

Section 601.507, 26 C.F.R., states: "The Tax Court has its own rules of practice and procedure and its own rules respecting admission to practice before it." 6 C.C.H. Stand.Fed.Tax Rep. ¶ 6017. Assuming, without holding, a power of attorney was required under ¶ 6013C(c), (1), quoted supra, said regulation of the Internal Rev-

enue Service should not extend to rule respondents' rights against the Rosen trust under this record.

█ The respondents undertook in good faith to represent the Rosen trust in the estate tax cases when no other person was doing so. The Successor Trustee was advised of this representation, was kept informed of the developments and progress, what the proposals meant in dollars and cents, and the Successor Trustee knowingly accepted said services. It stands admitted that respondents' work product for the period involved was used fully in behalf of the Successor Trustee for the benefit of the Rosen Trust in the final settlement of the cases. In the circumstances the Rosen trust, having received the benefit, is liable for the payment of a reasonable charge for respondents' services. See authorities cited under III and the Agnew, Donaldson, Sutliff, Sullivan, and other cases under IV, supra. See also Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833, 936 [60, 61]; Jesser v. Mayfair Hotel, Inc., Mo., 360 S.W.2d 652, 661. We base this result on the admissions against interest with respect to the use of respondents' work product on behalf of the Rosen trust.

The foregoing sufficiently disposes of the issues on this appeal.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by BOHLING, Special Commissioner, is adopted as the opinion of the Court.

HYDE, P. J., and HOLMAN and HENLEY, JJ., concur.

DONNELLY, J., not participating because not a member of the Court when the cause was submitted.